DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of:                           :
                                            :
    REGINALD J. ROGERS,                     :        Bar Docket No. 408-03
    D.C. Bar No. 440390                     :
                                            :
Respondent.                                 :

## REPORT AND RECOMMENDATION OF
## THE BOARD ON PROFESSIONAL RESPONSIBILITY

    Respondent is charged with violating nine provisions of the District of Columbia Rules of Professional Conduct during his representation of Hattie Mae Goode, an elderly and infirm widow who looked to Respondent to arrange her legal affairs and manage her finances in the years after her husband's death. The Hearing Committee found all the charged violations, including intentional misappropriation of assets Ms. Goode had entrusted to him, and recommended that he be disbarred and ordered to make restitution. Neither Bar Counsel nor Respondent has filed an exception.[1]

    We recommend that the Court find all the charged violations, except a violation of Rule 1.5(f) (charging an unreasonable fee), a charge that arose out of Respondent's conduct in 1992, before he was a member of the District of Columbia Bar. With regard to the sanction, we recommend that Respondent be disbarred and ordered to make full restitution for all property that he misappropriated from her.

---

[1] Respondent's participation in this matter generally has been passive. On the advice of counsel due to a pending criminal investigation, he declined to respond to Bar Counsel's inquiries and subpoenae or to answer the specification of charges. He attended the hearings without counsel, but he did not offer any evidence, cross-examine any of Bar Counsel's eight witnesses nor object to any of the exhibits offered or questions propounded by Bar Counsel.

## I. FINDINGS OF FACT

The following facts have been established by clear and convincing evidence:

1.       Respondent is a member of the District of Columbia Bar, having been admitted by motion on January 10, 1994, and assigned Bar number 440390. HCR ¶1.[2] He also is a member of the Iowa Bar, having been admitted on August 22, 1983, and the Nebraska Bar, having been admitted on August 24, 1983. BX A.

2.       Sometime in the early 1990s, the person who had been helping Hattie Mae Goode and her husband, Cleophas Goode, residents of the District of Columbia, with their tax returns retired and recommended Respondent to succeed him.  Tr. at 77-78. Respondent had helped the couple with their taxes for a year or two when, in April 1992, the Goodes retained him to prepare and supervise the execution of wills and powers of attorney for them.  BX 2.  He charged the Goodes $900 for these services, an amount which they paid by a check dated April 24, 1992.  HCR ¶4.

3.       A little over two years later, in August 1994, Cleophas Goode died.  HCR ¶5. Hattie Mae Goode was 81 years of age at the time of her husband's death.  Tr. at 41. She and her husband had no children.  Tr. at 42.

---

[2]  Findings of the Hearing Committee are cited as "HCR ¶__."  Citations to portions of the hearing transcript and the exhibits received in evidence are in the form "Tr. __" and "BX __."

4.      After Cleophas Goode died, a kind of friendship developed between Respondent and Hattie Mae Goode. Tr. at 78-80; 126-127. Respondent and his family on several occasions came to Ms. Goode's house and sang for her, "to cheer her up." Tr. at 79. By 1998, Respondent was coming to Ms. Goode's house on "most Sundays" and performing various household chores, like mopping the floors, washing the dishes, cleaning the rug or doing laundry. Tr. at 90-92; 127, 128. He would take her to church and to the doctor, and Ms. Goode came to regard "him as a son." Tr. at 79, 92. She believed he "was taking very good care of her." Tr. at 92.

5.      Many of the services Respondent performed for Ms. Goode were non-legal in nature, but both Ms. Goode and Respondent regarded Respondent as "her attorney." HCR ¶6; Tr. at 103, 130; BX 4. Respondent described the relationship as follows, in a statement he gave in November 2003 to a special agent of the Federal Bureau of Investigation who, on request of the U.S. Attorney's Office, was investigating the allegations in Ms. Goode's complaint to Bar Counsel (hereinafter referred to as "Respondent's FBI Statement" or "his FBI Statement"):

> I have been Ms. Hattie Mae Goode's attorney since on or about 1994.
>
> Over the course of the years, I did a large amount of legal work as well as acted as a caretaker and friend over the course of the years for Mrs. Goode.

BX 4 at 4; Tr. at 188-99.

6.      On February 24, 2000, Ms. Goode executed a document entitled "Durable General Power of Attorney," which authorized Respondent to act for Ms. Goode under 21 specific powers and a broad, general grant of authority. BX 6; Tr. 182. Among the

specific powers were powers "[t]o write checks upon or otherwise withdraw all funds or account balances now or hereafter standing to [her] credit . . . on the books of any bank" and "to transfer, redeem, convert or exchange any security . . . that now belongs to [her] or may belong to [her] in the future . . . that may be issued by the United States . . . ." BX 6, ¶¶ 2, 4. In addition to those and other specific powers, paragraph 22 of the Durable General Power of Attorney granted Respondent the power "to perform any other acts of any nature whatsoever, that ought to be done or in the opinion of [her] attorney ought to be done, in any circumstances as fully and effectively as [Ms. Goode] could do, if acting personally." BX 6, ¶ 22. The Durable General Power of Attorney also provided that it "shall not terminate upon [Ms. Goode's] disability or due to lapse of time." *Id.* at 4.

7.     Ms. Goode was under the impression that Respondent "wouldn't take any money from her" for the services he rendered on her behalf. Tr. at 93, 165. In fact, however, Respondent, in the years after Ms. Goode executed the Durable General Power of Attorney, paid himself from Ms. Goode's funds without asking her, without giving her any bills or accountings, and without providing her with a writing setting forth any basis or rate of the fee he was taking from her bank account. HCR ¶7. As Respondent said, in his FBI Statement, "[a]s [a] way of payment for my services, I would cash out Ms. Goode's saving bond [*sic*] and draw down money from her bank accounts." BX 4 at 4. He also admitted in his FBI Statement that he took "approximately $150,000" belonging to Ms. Goode in addition to "payment[s] for [his] services" and "used [it] for [his] own purposes. *Id.*

8.     Respondent's admission of his embezzlements of Ms. Goode's assets is amply corroborated by evidence that, over a period beginning in March or April 2000 and

running through April 2003, he used the powers Ms. Goode had granted to him in the Durable General Power of Attorney to redeem some sixty-two U.S. Series E bonds issued in the names of Ms. Goode and her late husband. BX 17 at 18-60. The total face value of these bonds was $43,100, but because the bonds had been purchased in the 1970s and 1980s, the total redemption proceeds from the redemptions, including accrued interest, were in excess of $150,000.

9.    Also corroborating the admissions in his FBI Statement is the fact that Respondent drew multiple checks on Mr. Goode's SunTrust Bank accounts for matters that were unrelated to any of her affairs and of which she was unaware. HCR ¶12. He also wrote checks payable to himself or to "cash" from Ms. Goode's SunTrust accounts. *Id.* During the period of six months from August 2001 to February 2002 alone, he drew twenty of these checks, which totaled $74,434.82. *Id.*

10.    Respondent did not, however, tell Ms. Goode that he was using money from her bonds for himself or give her any accounting for that money. Tr. at 47. And Ms. Goode did not authorize him to use her assets for himself. *Id.* At the time of her testimony, Ms. Goode did not know whether she had any bonds left. Tr. at 47-48.

11.    In 2003, Ms. Goode's health began to fail. Gwendolyn Wilson, a cousin of Ms. Goode's late husband, had grown up knowing Ms. Goode. Tr. at 88-89. Her mother and Ms. Goode had been "best friends." After Ms. Wilson's mother died in 1998, Ms. Wilson "started calling and visiting [Ms. Goode] more regular because she had lost my mother and I felt like she needed the companionship." Tr. at 89. During one of Ms. Wilson's visits in September 2003, she found Ms. Goode "dirty" and experiencing

unusual lapses of memory. Tr. at 94. Ms. Goode "just stared into space." *Id.* Several days later, Ms. Wilson "called to find out how [Ms. Goode] was doing." Tr. at 95. The phone was answered by Respondent, who told Ms. Wilson that Ms. Goode was "going down," an expression that Ms. Wilson understood to mean that Ms. Goode was "getting sick." *Id.*

12.    At the end of September 2003, Ms. Goode was hospitalized for "about a week." Tr. at 105-106. Her sister, Agnes Gay, and her niece, Alma Robinson Moses, a "law school graduate," traveled to the District of Columbia from their homes in California to care for Ms. Goode. Tr. at 106, 110, 173. They were surprised to find Ms. Goode "[v]ery, very frail, emaciated-looking" and her house "in disrepair" and "disarray." Tr. at 135. It was clear to them that Ms. Goode "could no longer live in her home alone," a fact that was confirmed by Ms. Goode's doctor. Tr. at 175.

13.    Ms. Moses, Ms. Gay and Ms. Goode held a meeting with Respondent at Ms. Goode's house on Friday, October 3, 2003, to discuss "how much money was available from the funds that she had saved for this period of her life." Tr. at 175-76. Ms. Moses asked Respondent "how much money was still available for [Ms. Goode's] care." Tr. at 175. He told them Ms. Goode had "about $55,000," an amount that "really startled" Ms. Goode. Tr. at 176-77. She asked if that was all. *Id.* Respondent acknowledged that Ms. Goode once had more, but he told her that she "had a lot, but [she] spent a lot." Tr. at 177. At Ms. Moses' request for an accounting for the assets that Ms. Goode had once possessed, Respondent said that "the books are open," and he promised to "come back on Monday and bring account records" so that they could review them together. Tr. at 177-78.

14.     Before meeting again with the three women, Respondent went to SunTrust Bank and withdrew all the cash remaining in Ms. Goode's accounts ($5,972.49), effectively closing those accounts. BX 8; Tr. at 17-19.[3] He did so without Ms. Goode's knowledge.  Tr. at 45-46, 141, 183.   Ms. Goode and her relatives (Ms. Gay and Ms. Moses) discovered these withdrawals when they arrived at the bank shortly after Respondent. *Id.* When Ms. Moses telephoned Respondent from the bank to demand an explanation, Respondent told her that he had "the power of attorney and I have control." Tr. at 184.

15.     After learning of Respondent's withdrawal of all her funds on deposit in SunTrust Bank and his assertion of "control" by virtue of the Durable General Power of Attorney, Ms. Goode decided to "terminate his service."  Tr. at 45-46, 61-62 and 184. Accordingly, Ms. Moses drafted a termination letter, which Ms. Goode handed to Respondent when the four of them met on the evening of October 6, 2003. Tr. at 184-85; BX 9 at 1.

16.     Despite Respondent's assurance on Friday that his books were "open" and that he would "come back on Monday and bring account records" pertaining to his management of Ms. Goode's assets (*see supra* ¶13), Respondent came to the Monday

---

[3] Ms. Goode, Ms. Gay and Ms. Moses all testified that they learned of these withdrawals on October 6, 2003, which is the date on a letter that Ms. Goode handed to Respondent to revoke his power of attorney. BX 9; see Tr. at 45-46, 61-62, 183-85. The bank statements, however, indicate that most of the money was withdrawn on October 7, 2003. BX 8.

This difference in dates is not explained in the evidence (or anywhere else in the record).  One possible explanation could be that the bank posted Respondent's withdrawal slips on the day after he presented them.  In view of that possibility, we do not deem the difference in dates significant enough to require a rejection of the Hearing Committee's explicit findings regarding Respondent's withdrawal of the funds shortly before Ms. Goode's visit to the bank on October 6, 2003 and her handing Respondent the termination letter (BX 9 at 1) later the same day. *See* HCR ¶¶16-18.

evening meeting with no records that would "establish what had happened to Mrs. Goode's assets." Tr. at 182. He brought only "a copy of something called a living will . . . a power of attorney [BX 6] and a trust document — the Hattie Mae Goode Living Trust." Tr. at 181.[4] These items did not provide an accounting of Respondent's use of Ms. Goode's assets over the years.

17.    The termination letter that Ms. Goode handed to Respondent at the Monday evening meeting (on October 6, 2003) requested the following:

> I am requesting an immediate accounting of all funds which you had access to during the entire period of your representation. Please send records of all past and present assets, including any savings, checking and investment accounts, as well as savings bonds, and deeds in the name of Hattie Mae Goode, Cleophas Goode and the Hattie Mae Goode Living Trust. Please provide copies of all tax returns and attachments which you have completed for myself and the Trust beginning as early as 1990 and years since.

BX 9 at 1.

18.    The October 6 letter also requested Respondent to provide Ms. Goode with "all medical records and any other records concerning my health . . . as well as a copy of any and all life insurance policies and beneficiary designations" and "any other documentation related to your representation." BX 9 at 1. It expressly requested "this final accounting as soon as possible and no later that October 16, 2003. *Id.*

---

[4] The "Hattie Mae Goode Living Trust" was executed by Ms. Goode on May 17, 2000. BX 7. It operates like a will in that it provided for the distribution of Ms. Goode's assets upon her death. *Id.* at 3-4.

19.    Two days later — on October 8, 2003 — Ms Goode sent a second letter to Respondent that recited her revocation of the Durable General Power of Attorney and a "health care power of attorney," enclosed a "document amending the Hattie Mae Goode Living Trust" and requested him to "forward to [her] at [his] earliest convenience and no later than October 18, 2003, all documents related to these trust(s) . . . ." BX 9 at 2. She specifically notified him that he "no longer [had] any authority to make any transactions on my behalf or for the trust(s) which you established for my benefit." *Id.*

20.    Ms. Goode and her sister have repeatedly requested that Respondent turn over Ms. Goode's assets immediately so that she would have funds to meet her daily living needs, which she cannot meet. Tr. at 138, 145-46, 154-55, 157, 161-62. Since removing the last of the funds from her SunTrust accounts, Respondent has made only two payments of $1,000 to Ms. Goode. Tr. at 142-43, 157. He has given her no funds since November 2003, and he refuses to divulge details regarding where her assets, if any remain, may be found. Tr. at 161-62.

21.    As of the date of the hearing, Respondent had not provided any accounting or documents supporting his use of Ms. Goode's assets, despite multiple requests from Ms. Goode and her family, as well as from the FBI. Tr. at 47-48, 143, 154-55, 182, 194-195. Respondent has not made any meaningful restitution to Ms. Goode. Tr. at 157, 162.

22.    By letter dated November 19, 2003, the Office of Bar Counsel informed Respondent that it had docketed the matter for investigation, requesting that he provide, *inter alia*, (a) a chronology of his representation of Ms. Goode from its inception, (b) all records reflecting deposit and disbursement of Ms. Goode's entrusted funds pursuant to

Rule 1.15 of the Rules, (c) any accountings provided Ms. Goode, (d) any and all writings

setting forth the basis or rate of his fee, and (e) a copy of his office file in the Goode

representation. BX 10A at 2. The Office of Bar Counsel also requested that Respondent

account for each financial transaction he performed for Ms. Goode and incorporated by

reference two of Ms. Goode's letters to him requesting that he turn over to Bar Counsel

all of her papers and things. BX 10 at 2-3. The Office of Bar Counsel included a

subpoena for records responsive to the information sought from Respondent. BX 10 at 4;

BX 10B.

23.     Respondent failed to provide a substantive response to Bar Counsel's

inquiries or subpoenae, first requesting an extension of time for his response, then, "on

advice of counsel," he invoked his "rights under the Fifth Amendment of the Constitution

and "declined to offer a response at [that] time." BX 12-13.

24.     Due in large part to Respondent's failure to provide any accounting or

documents concerning his transactions with Ms. Goode's assets, the full amount of

Respondent's misappropriations from Ms. Goode and the uses to which he put the

misappropriated funds cannot be ascertained from the evidence in this matter. Bank

records in BX 17 demonstrate that, from March 2000 through April 2003, Respondent

redeemed savings bonds belonging to Ms. Goode that yielded more than $130,000.

There is no reason to believe, however, that all the bonds Ms. Goode owned are included

in that exhibit. Moreover, the evidence contains copies of checks that Respondent drew

on Ms. Goode's accounts with SunTrust Bank that do not appear to have been used for Ms. Goode.[5]

25.    The best evidence of the amount of loss Ms. Goode has suffered because of Respondent's predations is in the following two paragraphs of Respondent's FBI Statement, in which Respondent explains that a substantial amount of the funds entrusted to him were used for Respondent's "own purposes," not for the support and care of Ms. Goode:

> During the course of those years assisting Ms. Goode, I also ~~took~~ utilized[RJR] money from Ms. [2 of 3] Goode's savings bonds and bank accounts particularly from 1998 to the present, and used the money for my own purposes. I estimate that this amounts to approximately $150,000. I believe that this is the amount I currently owe Ms. Goode. ~~It represents money of hers that I used for which there was no service rendered or expense incurred.~~
>
> At the present time, I have in my custody approximately $30,000 of her savings bonds. I fully intend to ~~locate come up with~~ replace[RJR] approximately $150,000 from other sources not connected to Ms. Goode and fully expect to repay her, whatever that amount is determined to be, whether it is more or [3 of 3] less than the $150,000.

BX 4 at 4.

26.    Respondent has prior discipline in this jurisdiction in the form of two informal admonitions. BX 18 (failure to provide a writing communicating the rate or basis of his fee in violation of Rule 1.5(b) in connection with an employment law matter); BX 19 (in connection with Respondent's representation of estate and testamentary trust

---

[5] In trying to determine the total amount of Respondent's misappropriation, the total amount of the checks, of course, cannot be added to the total bond redemption proceeds because the bonds may well have been the source of at least a portion, and perhaps all, of the cash drawn down with those checks.

for which Respondent served as co-personal representative and co-trustee, Respondent failed to honor court order in violation of Rule 8.4(d), failed to provide competent representation, in violation of Rules 1.1(a) and (b), and failed to provide zealous representation in violation of Rule 1.3(a)).

## II.    CONCLUSIONS OF LAW

A.    MISAPPROPRIATION OF ENTRUSTED FUNDS AND FAILURE TO KEEP COMPLETE RECORDS – RULE 1.15(a)

A lawyer's special duties regarding "property of clients . . . that is in the lawyer's possession in connection with a representation" are spelled out in Rule 1.15. Subparagraph (a) of that rule mandates that the lawyer must hold the property "separate from [his] own property" and that "complete records of such . . . property shall be kept by the lawyer and . . . preserved for a period of five years after termination of the representation." Bar Counsel has charged that Respondent violated these provisions by (1) intentionally and/or recklessly misappropriating funds belonging to a client and (2) failing to maintain complete records of entrusted funds. The Hearing Committee found both violations established by clear and convincing evidence.

*Intentional Misappropriation.* Misappropriation is "any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyers' own purpose." *In re Anderson*, 778 A. 2d 330, 335 (D.C. 2001) (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C. 1983)). Moreover, to sustain Bar Counsel's charge that Respondent misappropriated Ms. Goode's funds "intentionally and/or recklessly" (Specification of Charges at 7), the clear and convincing evidence must establish that Respondent "handle[d] entrusted funds . . . in a way that reveals either

12

an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds." *Anderson*, 778 A.2d at 339.

Respondent, in his FBI Statement, admits that he "utilized money from Ms. Goode's savings bonds and bank accounts . . . for [his] own purposes," an admission that is abundantly corroborated by other evidence in the record. BX 4 at 4. He was not authorized to do so. *See* Findings of Fact ¶¶7 and 10, *supra*. Although Respondent also expressed in that statement an intention to repay Ms. Goode, his "temporary use" for his own purposes is sufficient to constitute a misappropriation. *Anderson*, 778 A.2d at 335. Respondent's own statements, corroborated by the documentary and testimonial evidence in this matter, constitute clear and convincing evidence that Respondent intentionally misappropriated Ms. Goode's funds in violation of Rule 1.15(a)

The non-legal services that Respondent performed for Ms. Goode over the years may suggest that the property Ms. Goode entrusted to him was not in his "possession in connection with a representation" within the meaning of Rule 1.15(a). In fact, when asked what she understood was Respondent's relationship with Ms. Goode, Gwendolyn Wilson testified that she "didn't see it as an attorney-client relationship." Tr. at 103. Both Ms. Goode and Respondent, however, regarded him as "her" attorney, even though Respondent also said that Ms. Goode "was not only a client, she was a friend." Tr. at 91. He said in his FBI Statement that he had been Ms. Goode's attorney since "on or about 1994," the year Cleophas Goode had died. BX 4 at 4. And he explicitly said that he "did a large amount of legal work as well as acted as a caretaker and friend over the course of the years for Mrs. Goode." *Id*. The Hearing Committee expressly found "that an attorney client relationship existed" between Respondent and Ms. Goode. HCR at 16.

Employing the "substantial evidence on the record as a whole" test under Board Rule 13.7, we uphold that finding.

Clients not uncommonly ask their lawyers to serve them as trustees, executors or in other fiduciary capacities that, strictly speaking, are not reserved to members of the bar. As Professor Wolfram observes, "ambiguities can arise because of the multiple roles that a lawyer may play." Charles W. Wolfram, Modern Legal Ethics § 4.8 at 178 (1986). The fact that a lawyer may simultaneously serve a client in a fiduciary role in addition to his role as lawyer, however, does not mean that the lawyer is relieved from the duties imposed by Rule 1.15(a) on the ground that he holds client property as a non-lawyer fiduciary rather than as lawyer.

> Because the professional fiduciary rules apply generally, most courts have not been impressed with arguments that the requirements of the professional rules should be narrowly applied to client-lawyer relationships and have applied the rules even if the lawyer was technically functioning as a trustee, guardian, real estate broker, or corporate . . . . The general rule of [Model Rule] 1.15(a) limits the fiduciary rules to funds or property that comes into a lawyer's possession "in connection with a representation" but seems subject to an equally broad interpretation.

*Id.*[6]

---

[6] The Court has approved sanctions upon lawyers who mishandled funds while acting in a fiduciary role, even though no technical attorney-client relationship was present. *See, e.g., In re Burton*, 472 A.2d 831, 837 (D.C. 1984) (per curiam) (appended Board Report) (lawyer serving as a court-appointed trustee for sale of realty); *In re Burka*, 423 A.2d 181, 187 (D.C. 1980) (en banc) (lawyer serving as a court-appointed conservator). In this case, Respondent's role as fiduciary under a power of attorney executed in his favor by Ms. Goode while Respondent was her lawyer can fairly be regarded as a part of his representation of her as a lawyer.

The circumstances in this case are not like those in *In re Gil*, 656 A.2d 303 (D.C. 1995), where the Court found it unnecessary to decide whether the respondent "acted in the course of an attorney-client relationship or whether the existence of that relationship is a pre-condition of a violation of Rule 1.15." *Id.* at 304.[7] In that case, there was a question whether any attorney-client relationship existed at all between the respondent and one who had entrusted him with her funds. By contrast, Respondent unquestionably performed legal services for Ms. Goode, which entailed what Respondent himself characterized as "a large amount of legal work." BX 4 at 4. There is nothing to suggest that, in entrusting him with virtually all her assets, Ms. Goode did not regard him as her lawyer, who would employ his legal knowledge and experience on her behalf in accordance with the ethical principles governing the conduct of lawyers. Accordingly, we deem the "in connection with a representation" element in Rule 1.15(a) fully established in this case and uphold the Hearing Committee's finding that Respondent violated that rule by intentionally misappropriating the property of Hattie Mae Goode.

*Failure to Maintain Complete Records.* We also agree that Respondent violated Rule 1.15(a) by failure to keep complete records of his transactions involving the bonds and cash entrusted to him by Ms. Goode. Ms. Goode, who had an indisputable right to any records Respondent may have had concerning his handling of her property, demanded on October 6, 2003 that Respondent deliver to her "records of all past and present assets, including any savings, checking and investment accounts." BX 9 at 1.

---

[7] The Court explained in *Gil* that "respondent violated Rules 8.4(b) and (c) and [this] his misconduct was grave enough to require disbarment." *Gil*, 656 A.2d at 304. Finding him in violation of Rule 1.15, therefore, would have had no effect on the sanction imposed in that case.

But when he offered these records to Ms. Goode, he gave her only "a copy of something called a living will . . . a power of attorney and a trust document." Tr. at 181. These documents do not come anywhere close to being "complete records" of the property of Ms. Goode that Respondent held, and Respondent has not since provided Ms. Goode with any such records. The Hearing Committee's finding that Respondent did not keep or maintain the complete records required by Rule 1.15(a) satisfies the "substantial evidence on the record as a whole" test. We therefore uphold that finding.

B.   CRIMINAL ACT THAT REFLECTS ON HONESTY,
      TRUSTWORTHINESS OR FITNESS AS A LAWYER - RULE 8.4(b)

Rule 8.4(b) declares it professional misconduct for a lawyer to commit a criminal act that reflects adversely on [his] honesty, trustworthiness, or fitness as a lawyer in other respects." Under the Court's ruling in *Gil*, 656 A.2d at 304, we may look to the law of any jurisdiction that could have prosecuted respondent for the misconduct to determine whether a lawyer conduct is a "criminal act" under Rule 8.4(b). Since Respondent dealt with a District of Columbia branch of SunTrust Bank with regard to Ms. Goode's bonds and deposit accounts, and Ms. Goode resided in the District, we look to the District's criminal law.

> In the District of Columbia, a person commits the crime of theft 'if that person wrongfully obtains or uses the property of another with intent: (1) To deprive the other a of right to the property or a benefit of the property, or (2) To appropriate the property to his or her own use or to the use of a third person.

*In re Slattery*, 767 A.2d 203, 212 (D.C. 2001); *Gil*, 656 A.2d at 305 n.6; *In re Moore*, 704 A.2d 1187, 1193 (D.C. 1997) (per curiam) (appended Board Report).

Respondent's conduct falls well within that definition. He therefore has committed a theft of a property of substantial value, a criminal act that is held a violation of Rule 8.4(b). *Slattery*, 767 A.2d at 211 (criminal conduct, even in the absence of a conviction, violates Rule 8.4(b)). *Compare In re Stiller*, 725 A.2d 533 (D.C. 1999) (petition for rehearing pending) (conviction necessary to trigger DR 1-102(A)(3) (the predecessor to Rule 8.4(b))). Accordingly, we uphold the Hearing Committee's finding that Respondent violated Rule 8.4(b).

C.    CONDUCT INVOLVING DISHONESTY, FRAUD, DECEIT OR
      MISREPRESENTATION – RULE 8.4(c)

Conduct that involves any of four elements, "dishonesty, fraud, deceit, or misrepresentation" is prohibited by Rule 8.4(c). The Hearing Committee found that Respondent's conduct violated Rule 8.4(c) and that it involved all four elements.

There can be little doubt of the dishonesty of Respondent's conduct. Over several years, he simply helped himself to money that was entrusted to his care by Ms. Goode. What is more, Respondent compounded his dishonesty by not giving her any account of his stewardship during the entire time he served her. When she was startled at his telling her, in October 2003, that "about $55,000" was all she had left in October 2003, she asked him "[i]s that all?" He replied, "yes. You had . . . a lot, but you spent a lot." Tr. at 176-77.

Respondent thus represented to Ms. Goode that the reason she did not have more money in October 2003 than the $55,000 Respondent told her she had was due to her own expenditures that she either made or Respondent had made on her behalf. That representation was untrue, and Respondent knew it was untrue, because, as he admitted to

the FBI agent less that 60 days later, he knew that he had used $150,000 of Ms. Goode's funds for his own purposes. There is no evidence, however, that Respondent ever corrected his statement to Ms. Goode.

Respondent's conduct therefore easily satisfies the Rule 8.4(c) elements of dishonesty, deceit, fraud and misrepresentation. Accordingly, it violates that rule.

D.     VARIOUS OBLIGATIONS OF REPRESENTATION – RULES 1.3(b)(2), 1.3(c), 1.4(a), 1.5(b) AND 1.16(d)

Rules 1.3, 1.4, 1.5 and 1.16(d) all prescribe duties that arise from the lawyer-client relationship. They all in some way inform the manner in which a lawyer should serve his client in the matters for which he is engaged. Rule 1.3 stems from the idea that, as stated in the Comment [1] to that rule, "[a] lawyer should act with commitment and dedication to the interests of the client." With protecting and furthering a client's interests the lawyer's overarching consideration, subparagraphs 1.3(b)(2) and 1.3(c) of that rule impose the specific duties of, first, "not intentionally . . . prejudic[ing] or damag[ing] a client" and, second, "act[ing] with reasonable promptness in representing a client." The Hearing Committee found that Respondent's conduct violated both rules. We agree. He intentionally "prejudiced and damaged" his client by depriving her of property she and her husband had saved over the years to support themselves in their declining years. Respondent violated his duty to act with "reasonable promptness" when he did not respond to Ms. Goode after she asked him on October 6, 2003, to advise her what funds she had left to take care of her and to give her a full account of his use of her funds.

Rules 1.4(a) and 1.5(b) deal with the lawyer's obligation to keep his client informed both about the matters for which he was retained and the terms of his retention. Rule 1.4(a) provides that a "lawyer shall keep a client reasonably informed about the status of a matter" — an obligation that Respondent came nowhere near fulfilling during the years he served as Mrs. Goode's lawyer and trusted caretaker. *See, e.g.,* Findings of Fact ¶¶7, 10, 13, 20 and 21, *supra.* Rule 1.5(b) requires a lawyer to communicate "the basis or rate of the fee" to the client in writing. Respondent did not do so. But he nonetheless did, "[a]s [a] way of payment for [his] services . . . cash out Ms. Goode's saving bond and draw down money from her bank accounts" without telling her. BX 4 at 4; Finding of Fact ¶10, *supra.* He therefore not only violated the letter of Rule 1.5(b), but his violation provides a paradigm of the kind of abuse the rule is designed to avoid — a client who has no idea of the fees the lawyer is charging for his services.

As for the requirement in Rule 1.16(d) that, "in connection with any termination of representation, a lawyer take timely steps to . . . protect a client's interest, such as . . . surrendering papers and property to which the client is entitled," Respondent admitted on November 25, 2003 — seven weeks after Ms. Goode had termination his representation of her — that he still had "in his custody approximately $30,000 of [Ms. Goode's] savings bonds." BX 4 at 4. At the time of the hearing he had not returned these funds to Ms. Goode. The record suggests no justification for that blatant disregard of his client's interest in violation of Rule 1.16(d).

E.      COLLECTING A FEE PROHIBITED BY LAW – RULE 1.5(f)

Bar Counsel has charged Respondent with "collect[ing] an unreasonable fee."

Specification of Charges at 8. That charge is based upon two theories, each arising out of a separate set of facts. First, Ms. Goode and her husband paid Respondent a fee of $900 for preparing their wills in 1992, a time when he was not a member of the District of Columbia Bar. Bar Counsel maintains that the $900 fee was unlawful and therefore in violation of Rule 1.5(f). Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction at 21. Second, Bar Counsel contends that Respondent collected an excessive fee from Ms. Goode after her husband died and she had come to depend upon Respondent, not only as her lawyer, but also as a sort of all-purpose handyman and chauffeur. That contention is based upon testimony of the FBI agent who interviewed Respondent in November 2003. The agent testified that Respondent said he paid himself a "$7,500 annual bill" out of Ms. Goode's funds, some of which was payment for "non-legal services" that, Bar Counsel maintains, "could have been rendered much less expensively by a non-lawyer." *Id.* at 22.[8]

The Hearing Committee did not rely upon Bar Counsel's second theory. Based on Bar Counsel's first theory (relating to the $900 fee in 1992) and a theory that Bar Counsel did not advance, however, the Hearing Committee held that Respondent violated Rule 1.5(f), which prohibits charging a fee prohibited by law. *See* HRC at 22-23. We have concluded that all the theories are either unsound or not supported by the record and recommend that Bar Counsel's Rule 1.5(f) charge be dismissed.

---

[8] Bar Counsel's excessive fee argument appears beyond the scope of the Specification of Charges, which does not charge Respondent with a violation of Rule 1.5(a) and does not allege that Respondent was overcharging Ms. Goode for services that she could have obtained "less expensively" elsewhere.

At the time Respondent charged the Goodes a $900 fee for preparing and supervising the execution of their wills and powers of attorney, he was not within any of the categories of persons that are subject to the disciplinary jurisdiction of the District of Court of Appeals and its Board. *See* D.C. Bar R. XI, § 1(a).[9] He thus was not subject to the disciplinary jurisdiction of the Court or the Board, and his conduct was not subject to the District of Columbia Rules of Professional Conduct.[10]

Respondent did become a member of the District of Columbia Bar in 1994 and therefore has been subject to the disciplinary jurisdiction of the Court and Board since 1994. Nothing in D.C. Bar R. XI or the District of Columbia Rules of Professional Conduct, however, authorizes the *ex post facto* application of the disciplinary rules. It might be argued (although Bar Counsel does not do so) that as a member of the Iowa and

---

[9] D.C. Bar R. XI, § 1(a) provides that the following persons are subject to the disciplinary jurisdiction of the District of Columbia Court of Appeals and its Board on Professional Responsibility:

  (a) all members of the District of Columbia Bar;

  (b) all persons appearing or participating *pro hac vice* in any proceeding in accordance with Rule 49(c)(1),

  (c) all persons licensed as Special Legal Consultants under Rule 46(c)(4), and

  (d) all persons who have been suspended or disbarred by the District of Columbia Court of Appeals.

  In 1992, Respondent was not in any of these four categories. He did not become a member of the District of Columbia Bar until 1994. *See* Finding of Fact, ¶1, *supra*.

[10] Bar Counsel quotes a portion of Rule 49(b)(2)(A), which reads, "[o]ne is presumed to be practicing law when engaging in . . . preparing any legal document, including any . . . will" in support of her charge that Repondent violated Rule of Professional Conduct 1.5(f) by charging a fee for preparing a will in 1992. Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction at 21. The Rule 49(b) presumption that one is "practicing law," however, has nothing to do with the scope of the disciplinary jurisdiction of the Court or the Board. The persons subject to that jurisdiction are identified in D.C. Bar R. XI, § 1(a). The fact that a person not identified in D.C. Bar R. XI, § 1(a), and therefore not subject to the District's disciplinary jurisdiction, might be "presumed to be practicing law" because of his unauthorized practice in the District does not mean that he thereby becomes subject to the District's disciplinary jurisdiction.

Nebraska bars in 1992, Respondent might be disciplined by the District of Columbia Court of Appeals for a violation of the Iowa or Nebraska rules of professional conduct by virtue of the choice-of-law provisions in Rule 8.5(b).  The subsection of Rule 8.5(b) that arguably might be applicable in this case reads as follows:

> In [any] exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows:
>
> . . .
>
>> (ii)  If the lawyer is licensed to practice in this and another jurisdiction, the rules to be applied shall be the rules of the admitting jurisdiction in which the lawyer principally practices; provided, however, that if particular conduct clearly has its predominant effect in another jurisdiction in which the lawyer is licensed to practice, the rules of that jurisdiction shall be applied to that conduct.

Rule 8.5(b)(2)(ii).

As the circumstances in this case illustrate, however, that subsection is best understood to intend that the lawyer be licensed in both the District of Columbia and another jurisdiction at the time he engages in the charged conduct.  Applying the subsection to a case in which both bar memberships are not contemporaneous with the the charged conduct would lead only to incongruous results.  Assume that Respondent has principally practiced in the District of Columbia since he joined this bar in 1994 (which the record suggests, but does not establish).  The District of Columbia disciplinary rules would then apply under both alternative tests in Rule 8.5(b)(2)(ii) — the "principally practices" test and the "predominant effect" test.  But the resulting application of the District rules to conduct in which Respondent engaged while he was

not a member of the District of Columbia Bar would be inconsistent with D.C. Bar R. XI,

§ 1(a).

Our disciplinary jurisdiction is defined in a simple and straightforward manner in

D.C. Bar R. XI, § 1(a).   That jurisdiction should not be expanded by a strained

interpretation of Rule 8.5(b)(2)(ii), a choice of law provision that does not purport to

grant disciplinary jurisdiction.   Accordingly, we regard the $900 fee Respondent charged

the Goodes in 1992 as outside our disciplinary jurisdiction.

Bar Counsel's second theory for her charge that Respondent violated Rule 1.5(f)

is based upon the following testimony of Special FBI Agent John C. Cotter concerning

his interview with Respondent on November 25, 2003:

> Q.    Did the Respondent indicate during the course of your interview how much in fees and expenses was a normal year for Mrs. Goode in terms of what she paid out?

> A.    A normal year, and an estimate on behalf of [Respondent], was that the bills and expenses that were incurred by Ms. Goode and paid by [Respondent] on her behalf were approximately $7,500 a year.

> Q.    And did [Respondent] indicate what that $7,500 a year was for?  Was it for legal, for nonlegal work.

> A    It was both.  There was some legal work which he did, or if it wasn't legal work, it was work done which took away from his legal practice.

> For instance, there were some dental and doctors' visits, some types of services that [Respondent] performed for her which were in the middle of the day, when he could be representing clients.

> So he would charge her, he told us, $65 an hour for those types of things.  And that's included in the $7,500 a year.

Tr. at 193-94.

The statements of Respondent related in that testimony were not included in Respondent's FBI Statement and have not been adopted in any way by Respondent. But even assuming that Agent Cotter's testimony is sufficient to establish the amount and rate of fee Respondent was taking for himself out of Ms. Goode's funds, no evidence in the record would support a finding that $65 an hour — or $7,500 a year — would have been excessive compensation for the services Respondent was providing Ms. Goode. The record reveals nothing about compensation that other lawyers might charge in circumstances similar to Respondent's circumstances, and there is no evidence regarding compensation customarily received by professionals who, as part of their responsibilities related to the financial well-being of an elderly widow, also undertake to perform the kind of personal support services that are loosely described in this matter.

Bar Counsel's assertion that services for which Respondent took fees out of Ms. Goode's funds "could have been rendered much less expensively by a non-lawyer" (*supra*, pp. 20-21) not only has no substantial support in the record, it also is insufficient to establish that Respondent charged any excessive fee. "[C]harging or collecting unreasonably high fees" is the conduct prohibited by ABA Model Rule 1.5(a), which DC Rule 1.5(a) tracks. 1 Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering § 8.2 at 8-6 (3d Ed. Supp. 2003); *see also id.* §8.4 at 8-10 ("Model Rule 1.5(a) warns that overcharging may result in disciplinary sanctions."). And the "reasonableness of a fee" can be determined only upon consideration of, among other things, the eight factors listed in Rule 1.5(a). The evidence in this matter is not sufficient to make any such determination.

The Hearing Committee did not find a violation of Rule 1.5(f) on the ground that Respondent charged an excessive fee for any of his legal or non-legal work, but it based its finding that Respondent violated Rule 1.5(f) on the facts that "Respondent plundered Ms. Goode's bank accounts and bonds without her knowledge" and "his behavior was criminal." HCR at 23. Respondent, however, does not attempt to justify all his takings from Ms. Goode as a fee for his services. He stated that he used "approximately $150,000" of the funds he took for his own purposes and that he "fully intend[ed] to . . . repay her, whatever that amount is determined to be." Findings of Fact ¶25. At least that portion of the misappropriated funds cannot be considered a fee.

Rule 1.5 generally is a rule designed to regulate the fee arrangements between lawyers and clients. In that context, the ostensible purpose of subsection (f) of Rule 1.5 is not to transform an intentional misappropriation into an unlawful fee, and there is no reason to stretch Rule 1.5 to prohibit conduct that is adequately dealt with in Rules 1.15, 8.4(b) and 8.4(c). We do not agree that Respondent's serial misappropriations of funds that Ms. Goode entrusted to him were violations of the narrow, fee-regulating provisions in Rule 1.5.

## III.   SANCTION

The Hearing Committee concluded that Respondent's violations required that he be disbarred under the holding of *In re Addams*, 579 A.2d 190 (D.C. 1990) (en banc). We agree. As the Court stated that holding, "in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence." *Id.* at 191. Respondent's

conversion of large amounts of Ms. Goode's funds to his own use was not due to negligence. The clear and convincing evidence establishes the standard for intentional misappropriation laid down in *Anderson*. Respondent "purposely dealt with and used the funds owed to [his client] as his own." *Anderson*, 778 A.2d at 339; *see also In re Romansky*, 825 A.2d 311, 316 (D.C. 2003). No extraordinary circumstance calls for a lesser sanction. *Cf. In re Wheeler*, Bar Docket 372-00 at 31 (BPR May 10, 2004). As the Hearing Committee rightly observed, "Respondent's extraordinary shameful and deceitful actions cry out for disbarment." HCR at 23.

As the Hearing Committee recognized, however, disbarment does not exhaust the actions needed to serve the public and professional interests that disciplinary sanctions seek to vindicate. *See In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc); *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc). Both the Hearing Committee and Bar Counsel have recommended that Respondent's reinstatement be contingent upon his making restitution of all monies stolen from Ms. Goode. We agree. *See In re Alexander*, Bar Docket Nos. 202-98 and 060-99 at 32-33 (BPR May 6, 2004). Restitution is a "payment by the respondent attorney reimbursing a former client for the money, interest, or thing of value that the client has paid or entrusted to the lawyer in the course of the representation." *In re Robertson*, 612 A. 2d 1236, 1240 (D.C. 1992). Requiring restitution as a condition of reinstatement in intentional misappropriation cases serves to protect the public by restoring to the client any unearned benefit the attorney has taken. *In re Wright*, 702 A.2d 1251, 1257 (D.C. 1997) (per curiam) (appended Board Report).

Moreover, "[t]he obligation to pay interest is intertwined with the obligation to make restitution." *In re Huber*, 708 A.2d 259, 260-61 (D.C. 1998); *see also* D.C. Code § 28-3302(a) (2001).

Ms. Goode currently is at least 91 years old. She suffers from diabetes and has limited mobility. Tr. at 41, 137, 147, 166-67, 118. A woman who had been proud that "she wouldn't be a burden on anyone in her senior years because she had more than enough money to support herself" (Tr. at 93) now, due to Respondent's misconduct, must burden her relatives and friends just to meet her daily needs. These circumstances counsel that Respondent make full restitution as soon as possible. But even if full restitution cannot be made immediately, Respondent has no lawful basis for continuing to hold any assets or funds of Ms. Goode that are presently in his possession. We therefore recommend that Respondent's reinstatement be further conditioned upon his prompt surrender to Ms. Goode all papers and property now in his possession to which she is entitled, including, if not previously surrendered to her, the "approximately $30,000 of her savings bonds" that Respondent admitted he had in his custody in his November 25, 2003 written FBI Statement. BX 4 at 4.

## IV.   CONCLUSION

The Board recommends that the Court find that Respondent violated Rules 1.3(b)(2), 1.3(c), 1.4(a), 1.5(b), 1.15(a), 1.16(d), 8.4(b) and 8.4(c), and dismiss the charge under Rule 1.5(f). The Board further recommends that Respondent be disbarred and that his reinstatement be made contingent upon his (1) promptly surrendering to Hattie Mae Goode all papers and property in his possession to which she is entitled, including, if not

previously surrendered to her, the "approximately $30,000 of her savings bonds" that Respondent admitted he had in his custody on November 8, 2003, in his signed statement given to Special FBI Agent John C. Cotter on that date and (2) paying restitution to Hattie Mae Goode for all moneys misappropriated from her, with interest at 6% per annum, compounded quarterly and calculated separately on each amount he misappropriated for the date of the misappropriation until the date of Respondent's repayment of that amount.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _James P. Mercurio_
    James P. Mercurio

Dated: November 3th, 2004

All members of the Board concur in this Report and Recommendation, except Dr. Payne, Ms. Williams and Ms. Coghill-Howard, who did not participate.