## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 05-292 (RWR)** |
| | : | |
| **v.** | : | |
| | : | |
| **REGINALD JEROME ROGERS,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
## JUDGMENT OF ACQUITTAL AND A NEW TRIAL

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby opposes defendant's Motion for Judgment of Acquittal and a New Trial. In support of said Opposition, the government presents the following.[1]

## INTRODUCTION

On July 27, 2006, Defendant, Reginald Rogers was found guilty of thirteen counts of mail fraud, in violation of 18 U.S.C. § 1344 and was required to forfeit $385,000. On September 11, 2006, defendant filed a Motion for Judgment of Acquittal and a New Trial. Defendant's Motion for Judgment of Acquittal alleges that the evidence was insufficient to prove mail fraud, damages in general and as to specific victims and legally imposed duties. Memorandum of Points and Authorities in Support of Defendant's Motion for Judgment of Acquittal and a New Trial ("Defendant's Motion") at pp. 7-12. Defendant's Motion for a New Trial alleges that the Court erred in excluding the proffered expert testimony of Lanning Moldauer, Ph.D. and portions of Edward Varone's testimony "that deal with the scope of a power of attorney. Defendant's Motion at p. 13.

---

[1]    The government would incorporate as if fully rewritten herein, its Motions to Exclude Expert Testimony, Motion for Judicial Notice and its oral arguments to the Court regarding the issues raised in defendant's instant Motion.

Defendant further alleged that the court erred in taking judicial notice of the Rules of Professional Conduct. Defendant's Motion at p. 20. Defendant's motions are without merit and must be denied.

## FACTUAL BACKGROUND

The evidence at trial showed that defendant, Reginald Rogers, an attorney, conducted a long term fraud scheme where he carefully chose and designated several elderly, widowed women as "priority" clients. He ingratiated himself to these elderly women so that he could gain their trust and obtain control over their finances. Once defendant obtained access to his victims' bank accounts and savings bonds, he diverted funds from them to his own bank accounts or to cash. There was also evidence that defendant used money from client accounts to pay personal credit card bills and to reimburse other client's accounts to cover up prior fraudulent withdrawals. The documentary evidence and testimony showed that defendant diverted over four hundred thousand dollars from four elderly women and an estate for his own use.

Defendant's secretary, Cassandra Johnson, testified that three of the five victims in this case, Hattie Mae Goode, Minnie Beane and Danzel Lewis, were designated by defendant as "priority" clients. Ms. Johnson explained that defendant requested that any calls from these "priority" clients were to be put through immediately. She said that defendant prepared some legal documents for each of these "priority" clients, such as power of attorney and wills.[2] There was testimony from several witnesses and from defendant's oral statement to FBI Agent John Cotter that defendant visited his "priority" clients frequently in their homes. During these visits, defendant would perform

---

[2]    Her testimony reflected that defendant's fees for preparing these type of documents was no more than a couple of hundred dollars each.

household chores such as getting groceries, doing laundry and washing dishes.[3]  To paraphrase Danzel Lewis, defendant would perform some household tasks for her, the type of tasks that someone who cared for you would do.[4]  There was testimony that these elderly clients began to rely upon Rogers' visits for companionship as well as assistance.  Minnie Beane expressed to a number of individuals that she thought of the defendant as a son.[5]  Hattie Mae Goode talked about defendant all of the time.

Documentary evidence showed that once defendant took control over his elderly clients' finances by obtaining power of attorney, or in the case of one estate, becoming personal representative, he withdrew funds from client bank accounts and deposited those funds into his own accounts or in other client accounts.  Defendant admitted in a signed statement that he thought he "utilized" $150,000 of Hattie Mae Goode's money.  He also admitted to cashing her savings bonds and claimed he put them in various places for safe keeping.  Nick Novak testified that the records from the Bureau of the Public Debt and Hattie Mae Goode's bank accounts showed that

---

[3]     In his interview with Agent Cotter, defendant stated that the most he was entitled to from Hattie Mae Goode for legal and other services in a given year was $7,500.  Furthermore, defendant said that she did not owe him any money at the time of the interview in November 2003.

[4]     Danzel Lewis also testified that she never authorized defendant to take money from her bank accounts and put it in his own.

[5]     The defense presented many witnesses regarding defendant's assistance of Minnie Beane when she became unable to care for herself.  Remetter Freeman, a fellow church member of defendant, testified how she took Minnie Beane into her home for a month and did not charge her for her care.

approximately $55,000 of her savings bonds were redeemed by defendant, however, there was no corresponding deposit in Hattie Mae Goode's accounts.  Bureau of Public Debt records introduced also reflected approximately $16,000 in bonds that were not redeemed as of December 2003.

Viola Carr Davidson testified that during the time she and her husband were personal representatives of the estate of John Henderson, defendant requested and was provided signed blank checks.  Documents showed that on at least one occasion, defendant paid himself legal fees from the estate in the amount of $14,000.  According to the testimony and the documentary evidence, this legal fee was never disclosed to the heirs of the estate or the Orphan's Court in Maryland where defendant was required to submit yearly accountings.  Bank records from the estate of John Henderson showed defendant as payee on checks totaling approximately $80,000 prior to November 2003.[6]  The majority of those funds were reimbursed to the estate of John Henderson after defendant's interview with Agent Cotter in November 2003.

In March 2003, defendant obtained a lump sum reverse mortgage on Minnie Beane's home for $125,000.  The reverse mortgage paperwork showed that defendant paid himself a $4,000 fee for obtaining the reverse mortgage as her lawyer.  According to Minnie Beane's bank records, defendant was the payee on checks totaling over $130,000 from January 2002 to December 2003.  Further, there were $23,000 worth of cash withdrawals from Minnie Beane's account.  In August 2002 alone, the defendant wrote himself more then $13,000 worth of checks.  Defendant did not pay for Minnie Beane's caretakers from his own funds.  Indeed, they all testified that they were paid modest salaries on checks from Minnie Beane's accounts.  Documentary evidence showed that defendant used

---

[6]     There was one check made payable to Danzel Lewis for $10,000 from the estate of John Henderson in January 2003.

checks from three victims, Hattie Mae Goode, Minnie Beane and Julia Wooten, to pay over forty-five thousand dollars worth of his personal American Express bills. The records revealed that items defendant purchased such as plane and train tickets, men's clothing, and hotel rooms could not possibly have been for the benefit of these elderly women. The evidence also showed that defendant used money from Minnie Beane, the estate of John Henderson and Danzel Lewis to purchase rental property from Pauline Harvey. Documentary evidence revealed that defendant did not have enough money in his accounts to pay Pauline Harvey until he deposited like amount checks from his clients' accounts.

## ARGUMENT

### I.    Opposition to Motion for Judgment of Acquittal

#### A.    Standard of Review

We begin by reviewing the well established legal standard for evaluating a motion for judgment of acquittal under Rule 29. "A defendant challenging his verdict on sufficiency grounds bears a "heavy burden."" United States v. Si Lu Tian, 339 F.3d 143, 150 (2nd Cir. 2003) (citations omitted). The Court's role in assessing a sufficiency of the evidence claim is sharply circumscribed. See United States v. Poston, 902 F.2d 90, 94 (D.C. Cir. 1990). The Court is not a second jury weighing the evidence anew and deciding whether or not it would vote to convict the defendant. See id. Instead, review on sufficiency grounds is limited to determining "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). "There is no requirement of any direct evidence against the defendant; the evidence may be entirely circumstantial." Id. at 94, n.4 (emphasis added).

5

**B.**    **The Indictment Adequately States the Offense of Mail Fraud and was Supported by Sufficient Evidence at Trial**

The defendant claims that the "Indictment charges that Mr. Rogers obtained money for himself in violation of the District of Columbia Rules of Professional Conduct," that the "Indictment in this case does not state a Federal criminal offense" and that "[t]his case involves the first foray by the United States Attorney's Office in this district into the federal criminalization of attorney misconduct under the District of Columbia Rules of Professional Responsibility."   Defendant's Motion at pp. 1 and 2.  This myopic view, apparently tied to paragraph 2 of the Introductory Allegations and paragraph 11- Manner and Means of the Indictment, conveniently overlooks the other manner and means paragraphs that were the central focus of this case.   Among these paragraphs are: no. 6- making misrepresentations and material omissions to obtain client funds; no. 8- making large cash withdrawals from client accounts; no. 10- transferring funds between client accounts to conceal his unauthorized diversions; no. 12- obtaining a $125,000 loan secured by Minnie Beane's residence and using the loan proceeds to conceal diversions; no. 14- making a false representation to Danzel Lewis about funds withdrawn from her account and used to conceal diversions; no. 15- making false representations to Hattie Mae Goode, Agnes Gay and Alma Robinson Moses regarding Goode's remaining savings; no. 16- withdrawing remaining funds from Ms. Goode's accounts after being contacted by Alma Robinson Moses and Agnes Gay; no. 17- making false representations to Agnes Gay and Alma Robinson Moses regarding Goode's financial records and failing to produce such records; no. 18 and Count 13- sending a lulling letter and payment to Hattie Mae Goode and Agnes Gay; and no. 19- filing false accounts with the Prince George's County Orphan's Court that failed to reflect the defendant's fraudulent diversions from the

6

John Henderson estate. All of these allegations set forth the type of materially false representations, pretenses and deceptive conduct routinely criminalized by the mail fraud statute, whether or not the defendant is an attorney. They require no reference to any Rule of Professional Conduct. The evidence presented at trial was consistent with these allegations. In any event, as correctly noted by the Court in its instructions to the jury, it is not necessary that the government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme so long as they unanimously agree that defendant knowingly devised or participated in a scheme substantially the same at the one alleged in the indictment.

On the question of whether the Indictment states an offense, Fed. R. Crim. P 7(c)(1) provides: [t]he indictment of the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. The indictment and information must contain sufficient detail to adequately apprise the defendant of the nature of the charges against him. The indictment needs to contain all of the elements of the offense, whether or not such elements appear in the statute, but one that is sufficiently descriptive to permit the defendant to prepare a defense, and to invoke the double jeopardy provision of the Fifth Amendment, if appropriate. Hamling v. United States, 418 U.S. 87, 117 (1974); Russell v. United States, 369 U.S. 749, 763-72 (1962). In reviewing the sufficiency of an indictment, the courts will construe the document as a whole to ascertain whether the foregoing requirements have been met. United States v. Hand, 497 F.2d 929, 934-35 (5th Cir. 1974). Here, the Indictment clearly sets forth the Federal offense of mail fraud and its elements through various paragraphs, including those specifying the manner and means of the scheme. The defendant has never moved, pursuant to Fed. R. Crim. P. 7(d) to strike as surplusage any paragraphs from the Indictment. Even if he had, there is no variance in the proof concerning an

essential element of mail fraud that would have affected his substantial rights.  United States v. Jordan, 626 F.2d 928, 931 (D.C. Cir. 1980).

The defendant claims that under the Indictment, the government was required to prove that the defendant was acting as an attorney, was subject to legally imposed duties and violated those duties as a part of the scheme to defraud.  Defendant's Motion at p. 12.  The defendant further states that the government failed to present sufficient evidence regarding these matters, such that a rational jury could not have found the essential elements of the offense.  The defendant does not and can not cite any authority for the proposition that an essential element of mail fraud is that the defendant be an attorney, subject to legally imposed duties, and breach those duties as part of a scheme to defraud. Instead, he cites a number honest services fraud cases that are readily distinguishable from this case. These cases involve schemes directed at the intangible right of honest services of employees and public officials, rather than schemes directed at money or property, as is the case here.  See, 18 U.S.C. Section 1346.  In the honest services cases, the court's focus is on the intangible right to honest services directly relating to the fiduciary duties of the public official or employee.  One of the main cases defendant relies on is United States v. Brown, 459 F.3d 509 (5th Cir. 2006), a recent opinion arising from the Enron investigation.    In that case, the defendants were charged with a honest services fraud scheme that involved inflating Enron's reported earnings.  The court noted that Enron employees were breaching their fiduciary duties in pursuit of what they believed to be a corporate goal of meeting earnings targets, so that the scheme alleged was not one in which the defendant employees' interests sufficiently diverged from the interests of Enron to support a charge of honest services fraud.  "Therefore the Government must turn to other statutes, *or even the wire fraud statutes absent the component of honest services*, to punish this character of wrongdoing.

Brown, 459 F.3d at 522-23 (emphasis added).  Further limiting its holding, the court stated: "This opinion should not be read to suggest that no dishonest, fraudulent, wrongful, or criminal act has occurred. Id. We hold only that the alleged conduct is not a federal crime *under the honest-services theory specifically*." Id., (emphasis in original).  A review of this case and others cited by defendant make clear that they are limited to their facts and have little in common with a case such as this, where the defendant was charged with a scheme to defraud and to obtain money and property by means of materially false pretenses, representations and promises.  The trial evidence clearly established that the defendant engaged in such a mail fraud scheme that resulted in substantial losses to his victims.

### B.    Sufficiency of Evidence Regarding Loss

The defendant contends that the evidence is insufficient to support a finding of loss to his clients and that, therefore, there can be no mail fraud and forfeiture in this case.  Defendant's Motion at pp. 10-11.  As a matter of law, this is wrong because actual loss or injury need not be shown in a mail fraud prosecution.  Jordan, 626 F.2d at 931; United States v. Nelson, 988 F.2d 798 (8th Cir. 1993); United States v. Barber, 881 F.2d 345 (7th Cir. 1989); United States v. Strong, 702 F.2d 97 (6th Cir. 1983).  Aside from this, the evidence here is overwhelming that the defendant did, in fact, cause losses to his clients.  This evidence includes defendant's written statement (Ex. 17) admitting to utilizing approximately $150,000 of Ms. Goode's money, the financial records of Ms. Goode and other clients reflecting large dollar checks and other withdrawals from client accounts to the defendant or for his benefit, the $125,000 reverse mortgage relating to Ms. Beane's house, the

proceeds of which were used by the defendant, and the testimony from Danzel Lewis that she would only pay the defendant's fees by checks she signed and that she did not authorize the defendant to withdraw money from her accounts via wire transfer to pay himself.

Contrary to defendant's claims, the testimony of Nicholas Novak did not constitute opinion testimony or result in the burden of proof being shifted to defendant. Mr. Novak testified regarding his review of bank and other financial records of the defendant and his clients and about summaries depicting information from those records. Mr. Novak did not, on direct examination, testify that amounts shown on his summary charts represented victim losses due to the defendant's scheme to defraud. Instead, he testified that the summary charts reflected information from the records, with totals at the bottom of the charts. This is in keeping with the approved procedures in this circuit for such testimony. United States v. Weaver, 281 F.3d 228, 231-32 (D.C. Cir. 2002); United States v. Lemire, 720 F.2d 1327, 1350 (D.C. Cir. 1983). The defendant was given wide latitude on cross-examination to attempt to impeach the testimony concerning the charts and their preparation. As correctly noted by the Court, any opinion testimony Mr. Novak gave about losses to the victims occurred during this cross-examination. The defendant should not now be heard to complain about any improper testimony on this issue that he elicited.

Also beside the point is the defendant's complaint that no witnesses testified that his expenditures from assets of Minnie Beane and Julia Wooten were unauthorized.[7] Direct testimony on the issue is simply not required, because a mail fraud scheme can and frequently must be proven through circumstantial evidence. United States v. Alston, 609 F.2d 531, 538 (D.C. Cir. 1979);

---

[7]    Throughout his brief, defendant's characterization of the facts appears to be in the light most favorable to him, reversing the applicable standard of review under Rules 29 and 33.

United States v. Yost, 24 F.3d 99 (10th Cir. 1994). The evidence established that the defendant's method and routine of taking money for his own purposes was practically identical among all his victims. The jury was entitled to consider these facts and circumstances along with all of the defendant's other conduct. The defendant, for his part, presented his theories and explanations about the withdrawal and use of the clients' money and property. In reaching its verdicts, the jury fully considered and rejected these theories.

## II.    Opposition to Motion for New Trial

### A.    Defendant Has Failed to Show the Need for the Granting of a New Trial

#### 1.    Standard for a New Trial under Fed. R. Crim P. 33

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The grant or denial of a motion for a new trial is committed to the sound discretion of the trial judge and is reviewed only for abuse of discretion. See, e.g. United States v. Kelly, 790 F.2d 130, 133 (D.C. Cir. 1986); United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

#### 2.    Court Did Not Err In Excluding Expert Testimony of Lanning Moldauer, Ph.D

In his motion for a new trial, defendant contends that the "interest of justice" requires a new trial because the Court erred in excluding the expert witness testimony of Lanning Moldauer, Ph.D. Defendant provides no new arguments on this issue. Defendant's motion only refers to two of the four bases the Court considered in excluding Dr. Moldauer's testimony, namely that: 1) "the notice was late and that the Government would suffer prejudice" and 2) the Court was being "much too

clinical in its application of the <u>Daubert</u> standards to Dr. Moldauer's testimony." Defendant's Motion at pp. 13 and 15. The Court, in fact, excluded Dr. Moldauer's testimony because: 1) notice of Rogers' mental condition defense was prejudicially untimely; 2) support for admission of Moldauer's expert opinion testimony under <u>Daubert</u> was insufficient; 3) testimony had limited probative value regarding the defendant's <u>mens rea</u>; and 4) the testimony had a high danger of confusing or misleading the jury. July 17, 2006 Order at p. 15. Any one of the four bases were sufficient for the Court to exclude Dr. Moldauer's testimony. There was no error by the Court.

### a.    Defendant's Expert Witness Notification Was Prejudicially Untimely

The Court correctly ruled that defendant's expert witness notification was prejudicially untimely. There can be no dispute that defendant failed to meet the deadlines set by the Court and Federal Criminal Rule of Procedure 12.2 in providing his expert witness notification.[8] The government first requested notice of his expert witness testimony on August 19, 2005. The deadline for expert witness notification was December 20, 2005. Defendant's first notice to the government was provided on June 12, 2006. Defendant's supplemental notice was provided on July 5, 2006. As the Court noted in its July 17, 2006 Order, Fed. R. Crim. P. 12.2's purpose is to prevent surprise and delay during trial and allow adequate pretrial preparation. July 17, 2006 Order at 4.

Defendant's June 12, 2006 inadequate notice was provided to the government just before the trial and months after the original trial date. With the exception of Dr. Moldauer's opinion that "Rogers never intended to cheat his clients" the notice failed to provide Dr. Moldauer's

---

[8]    Pursuant to the August 8, 2005 Pretrial Order, expert witness notification was originally due on August 19, 2005. That deadline was extended twice to December 20, 2005. Defendant did not provide the government with notice until June 12, 2006. July 17, 2006 Order at p. 4.

qualifications, opinions or the basis for those opinions as required by Fed. R. Crim. P.

16(b)(1)(C)(ii).[9]  It was only after the government filed its Motions in Limine to Exclude Expert

Testimony, an extensive hearing on the motion and a Court Order did defendant provide the requisite

information to the government.[10]  As a result of defendant's delayed disclosure, the government did

not fully receive the required expert witness notice until the eve of trial.  That amount of time was

simply insufficient, given the nature of Dr. Moldauer's expert testimony relating to the defendant's

mental condition at the time he committed the crimes, for the government to obtain the appropriate

expert witness, adequately prepare its own expert witness, obtain a mental exam of defendant or

prepare for cross-examination.  As the Court in United States v. Buchbinder, 796 F.2d 910, 914 (7th

_____

[9]        Defendant's June 12, 2006 notice to the government regarding Dr. Moldauer stated:
"**Lanning Moldauer, Ph.D.**, a psychologist, who would testify about:  (a) the psychological impact
of Rogers' interactions with his elderly clients, (b) his capacity to manage a solo legal practice in
elder care law; (c) his opinion that, "Rogers never intended to cheat his clients, to harm them
financially, or to gain financially at their expense;" and (d)  Rogers behavior in failing to respond
to the criminal investigation, bar counsel proceedings and a civil law suit."

[10]        At that time, the government learned Dr. Moldauer was prepared to testify that 1)
Rogers was predisposed to attract and serve as clients elderly people in the predominantly African-
American community in which he and his family live and worship; 2) Rogers was predisposed to be
particularly empathetic to the condition and needs of elderly clients, particularly women; 3) Rogers
was predisposed to take on inordinate responsibilities for his elderly clients, and to undertake sole
responsibility for their care and to allow his duty to fulfill those responsibilities to overcome his
capacities to care for a business and his own family matters; and 4) Rogers allowed himself to be
expropriated by some of his elderly clients - - particularly Hattie Mae Goode and Minnie Beane - -
as their surrogate son, putting severe pressures on Rogers to fulfill their obligations; 5) because of
crises in Rogers' personal life, including his wife's illness and his son's disabilities, Rogers' capacity
to function as a sole practitioner was strained and he was incapable of attending to the administrative
details of a sole, elder care practice; and that 6) Rogers was unable to take a detached view of his role
with his clients, took on mattes beyond his capacities to deal with as an attorney, and took on matters
that other attorneys would shun; 7) Rogers became paralyzed in dealing with the allegations of this
criminal case, the allegations of Bar Counsel, and the allegations in the civil suit brought by Goode
and he did not respond appropriately.  See Defendant's Supplemental Notice of Expert Testimony
at p. 1-2.

Cir. 1986) appropriately stated, "[o]bviously, the government cannot conduct its own investigation into the validity of the defense of lack of mental capacity and decide if it will present expert witnesses in rebuttal until such time as it has knowledge of the psychiatric and psychological evidence the defense intends to present."[11]  Id. at 914.  As a result of the defendant's late notice, the government was unfairly prejudiced.  Moreover, defendant still fails to provide any excuse to the Court for the delay other than "counsel did not believe that the Government required any earlier notice as to the details of Dr. Moldauer's opinion."  Defendant's Motion at p. 14.

### b.     Defendant's Support For Admission of Dr. Moldauer's Expert Opinion Testimony Under Daubert Was Insufficient.

The Court correctly determined that Dr. Moldauer's proffered testimony did not meet the standards for admission under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993) and the Federal Rules of Evidence.  Defendant complains that the Court was "too clinical" in determining the reliability and relevance of Dr. Moldauer's proposed expert testimony regarding defendant's mental state.  Yet, defendant fails to set forth what evidence he presented to the Court that Dr. Moldauer's opinions were, in fact, reliable other then to contend that his conclusions were "a garden variety opinion derived from the standards of clinical psychology."  Defendant's Motion

---

[11]     While the Court has the discretion to require the defendant to submit to a mental examination pursuant to Rule 12.2(c)(1), the limited proffer provided by the defendant at this juncture does not give the government sufficient information to request an examination.  The Fed. R. Crim. P. advisory committee's note to Rule 12.2 state that subsection (c)(1), as amended "clarifies that the authority of a court to order a mental examination under Rule 12.2(c)(1)(B) extends to those cases when the defendant has provided notice, under Rule 12.2(b), of an intent to present expert testimony on the defendant's mental condition, either on the merits or at capital sentencing." Fed. R. Crim. P. 12.2(c) Advisory Committee Notes.  Rule 12.2(c)(1)(B) does not attempt to distinguish between the possible variations of how the defendant intends to use the evidence offered under Rule 12.2(b); instead it makes a blank rule that whenever a defendant files notice of intent under Rule 12.2(b), it is within the discretion of the court to order a mental examination.

at p. 15. "The proponent of the [expert] testimony has the burden to show that it is relevant and reliable and must do so by a preponderance of the evidence." Housing Works, Inc. v. Turner, 362 F. Supp. 2d 434, 447 (S.D.N.Y. 2005)(citations omitted). The government submits that Dr. Moldauer's opinions, including his unusual opinion that defendant was so overwhelmed by his predisposition to care for the elderly that he was unable to handle his law practice, was not derived from "garden variety" psychology.

The Court accurately articulated its gatekeeping function under Daubert and noted Judge Urbina's summarization of the law regarding experts, including that where an expert opinion relies upon "personal knowledge or experience . . . [t]rial courts must make certain that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' . . . A court may refuse to admit expert testimony if it concludes that 'there is simply too great an analytical gap between the data and the opinion proffered.' Groobert v. Georgetown College, 219 F. Supp. 2d 1, 6 (D.D.C. 2001)(citations omitted). The Court correctly found that Dr. Moldauer's proffered opinion was not supported by any meaningful basis in psychology, but was founded upon Dr. Moldauer's belief in what the defendant told him. See July 17, 2006 Order at p. 11. If allowed, Dr. Moldauer's expert testimony would have been nothing more than impermissible vouching for defendant.

Additionally, defendant neglected to provide any legal support to rebut the Court's conclusion that the law required and he failed to "demonstrate a sufficient link between the psychological opinions offered and the specific intent element of the crime to make the evidence helpful to the jury." Defendant's Motion at p. 16. The Insanity Defense Reform Act ("IDRA"), 18 U.S.C. §17, precludes mental health testimony short of insanity unless it is offered to negate a

defendant's specific intent.  Thus, a nexus between the defendant's mental state and the specific intent element of the crime is necessary for expert mental health testimony to be admissible.  See United States v. Worrell, 313 F.3d 867 (4th Cir. 2002).  This tight link is necessary to ensure that the defendant's evidence truly negates specific intent, and does not merely excuse or mitigate the offense by establishing the defendant's diminished responsibility.  United States v. Childress, 58 F.3d 693, 728 (D.C. Cir. 1995).

As such, Dr. Moldauer's opinions were not relevant to the issues at trial.  Defendant was charged with mail fraud.  The relevant element regarding defendant's mens rea is whether he had the specific intent to defraud his clients when he committed the affirmative acts alleged in the Indictment.  See O'Malley, Federal Jury Practice and Instructions Section 47.02 (5th ed. 2000).  Dr. Moldauer's opinions provided no link between the defendant's alleged mental condition and his specific intent to defraud or deceive.  See United States v. Mezvinsky, 206 F. Supp. 2d 661, 668 (E.D. Pa. 2002).  For example, Dr. Moldauer's opinions did not address defendant's specific intent when he when he transferred money from Danzel Lewis' bank account to his own bank account without telling her.  Nor did Dr. Moldauer's opinions relate to defendant's specific intent when he used client checks to pay his American Express bills.  Since Dr. Moldauer's opinions did not reference defendant's specific actions or his intent to defraud, it appeared defendant offered the testimony as an excuse or justification for his theft of client money, which the law prohibits.  Dr. Moldauer's proffered testimony appeared to be exactly what is prohibited-- "a subjective belief or unsupported speculation" that defendant's ability to perform as an attorney was compromised based upon his susceptibility to elderly women.  See  Daubert, 509 U.S. at 590.

    c.    **Dr. Moldauer's Expert Testimony Properly Excluded Pursuant to Fed. R. Evid. 403.**

Even assuming arguendo that Dr. Moldauer's expert testimony concerning his opinions that defendant was overwhelmed by his responsibilities to his elderly clients to the extent he could not function as a lawyer had a scintilla of relevance to this case, this evidence was properly excluded under Federal Rule of Evidence 403 because its dubious probative value was far outweighed by the unfair prejudice which would result from its introduction. "Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403, United States v. Hands, 184 F.3d 1322, 1328 (11th Cir. 1999). Defendant's attempt to testify through Dr. Moldauer was designed simply to confuse and improperly influence the jury. This is a textbook case for the application of Fed. R. Evid. 403 to exclude this testimony. The expected testimony regarding defendant's propensity to overextend himself for the elderly had no probative value since it was not relevant to an element of the crime charged in the indictment. Rather, the offering of this evidence was designed to put an "expert" sheen on what was testified to by many of defendant's witnesses and to evoke the sympathies of the jury in hopes that the jury would acquit defendant because he allegedly has had a hard life and did "nice" things for his elderly clients. In the case at bar, the unfairly prejudicial effect of the expert testimony defendant sought to introduce overwhelmingly outweighed any possible probative value of this testimony. As such, this Court correctly precluded the defendant from offering this extremely prejudicial evidence.

    3.    **Edward Varrone's Testimony Was Appropriately Limited**.

Defendant claims that the Court erred in limiting Edward Varrone's expert testimony. This

claim is without merit. Defendant's June 12, 2006 notice only provided the topics upon which Mr.

Varrone was expected to testify, which the Court correctly found did not meet the requirements of

Fed. R. Crim. P. 16.[12]   The Court, however, allowed defendant to provide a supplement to that

notice.[13]   That Supplemental Notice, with the exception of Mr. Varrone's opinions regarding

expenditures also failed to meet the requirements for Fed. R. Crim. P. 16.   Moreover, the

supplemental notice did not state that Mr. Varrone would opine regarding "legally-imposed duties"

other than whether defendant was subject to and whether he violated the Rules of Professional

Conduct.[14]  Defendant's Motion at p. 18.  Regardless, Mr. Varrone was allowed to give background

testimony regarding "the usual use of estate planning devices and powers of attorney, the customary

billing and disclosure practices followed, the customary fees charged for elder law services, and the

---

[12]     **Edward G. Varrone**, an attorney who practices elder law, who would testify about:
(a) the nature of the attorney-client relationship with elderly clients and in particular Rogers'
relationship with the alleged victims in this case; (b) the life-planning tools available to an attorney;
(c) the obligations of the attorney to the client under various planning tools; (d) the professional
duties that arise from the relationship; (e) procedures of Bar Counsel in supervising the ethical
conduct of attorneys practicing in the field of elder law and Rogers in particular.
See Government's First Motion to Exclude Expert Testimony, Exhibit 6.

[13]     Defendant's Supplemental Notice stated that Mr. Varrone would testify regarding,
1)" [t]he use of Powers of Attorney and other estate planning devices with respect to the needs of
the elderly; 2) the authority of an attorney in fact under power of attorney, including the powers of
attorney executed by Hattie May Goode, Danzel Lewis and others.  Mr. Varrone will testify that the
expenditures of Mr. Rogers were authorized by the Power of Attorney; [t]he services, both ordinary
and extraordinary, provided by attorneys engaged in the practice of Elder Law in the District of
Columbia and in Maryland; 3) [t]he fees customarily charge by attorneys practicing Elder Law in the
District of Columbia and Maryland; 4) [t]he disclosure and billing procedures under a power of
attorney when the principal is incapacitated; and 5) [w]hether the Rules of Professional Conduct
apply to Mr. Rogers' relation to his clients and whether Mr. Rogers violated any such rule."   See
Defendant's Supplemental Notice at pp. 3-4.

[14]     This proposed testimony of Mr. Varone's is a subject which the Court previously
precluded the government from presenting–evidence about whether the defendant violated the Rules
of Professional Conduct.

18

usual services provided by elder law attorneys in DC and perhaps in Maryland." July 17, 2006 Order at p. 20.

Defendant now complains that he should have been allowed to ask Mr. Varrone's whether he had an opinion regarding:  1) what a power of attorney entitled the holder to do; 2) the usual purpose of a power of attorney; and 3) the standard of conduct of an attorney under such a power. Defendant's Motion at p. 17.   The Court, in fact, allowed Mr. Varrone to testify generally about the usual use and purpose of powers of attorneys.   What the Court precluded was expert testimony relating to legal conclusions which invade the providence of the Court, specifically, "what a power of attorney legally entitles the holder to do, whether the defendant's expenditures were authorized under a power of attorney, whether the Rules of Professional Conduct applied to the defendant, and whether the defendant violated any such rule." July 17, 2006 Order at pp. 19-20.

Defendant concedes that Housing Works, Inc. v. Turner, 362 F. Supp. 2d 434, 448 (S.D.N.Y. 2005)[15] correctly sets forth the rule that expert testimony relating to 'conclusions of law is "well beyond the bounds of permissible expert testimony."' Defendant's Motion at p. 17.  Indeed, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.  Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997).  See also Weston v. Washington Metro. Area Transit Auth., 78 F. 3d 682, 684 n. 4 (D.C. Cir. 1996); Snap-Drape, Inc. v. Commm'r of Internal Revnue, 98 F. 3d 194, 198 (5th Cir. 1996).  Defendant argues, however, that Mr. Varrone should be able to opine whether an "attorney's conduct actually violated the duties

---

[15]      Defendant incorrectly states that the expert testimony regarding the proper measure of damages was excluded because it was an "ultimate issue in the case." Defendant's Motion at p. 17.  In fact, the Court excluded the testimony because "the proper measure of damages is a question of law for the Court.  Her opinion therefore is little more than a legal conclusion and well beyond the bounds of permissible expert testimony." Id. at 447-48.

alleged, " or that "his conduct did not depart from recognized legal standards that apply to elder law counsel.[16]" Defendant's Motion at 18. Defendant wrongly suggests that these opinions are not conclusions of law. These opinions are solely questions of law and require Mr. Varone to conduct a legal analysis in order to offer his opinions which is prohibited.

In an unpublished opinion, Media Sport et. al. v. Kinney Shoe Corporation, 1999 W.L. 946354, (S.D.N.Y. 1999), the district court excluded expert testimony where it, "did not concern only the customary practices of a trade or business. Rather, [the expert] gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendant's] conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant [of the contract].' Similarly in this case, defendant proposed to offer Mr. Varrone interpretation of the parameters of the power of attorney defendant possessed pursuant to documents he drafted for his clients and whether his actions fell within the power of attorney. This testimony necessarily require a legal analysis and legal conclusion.

In Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994), the objectionable expert testimony required a legal interpretation of what "deliberate indifference" means under the law. As the Berry court noted, it did not matter whether an expert was qualified to give a legal conclusion. Indeed, "[w]hereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury . . ." Id. at 1354.

---

[16]    He further claims, that Mr. Varrone's proposed expert testimony was proper because it did not encompass an "ultimate issue in the case." Defendant's Motion at p. 17. Whether the testimony related to the "ultimate issue in the case" was not the basis upon which the Court limited Mr. Varrone's testimony. Indeed, Fed. R. Evid. 704(a) does not preclude a witness from testifying as to the ultimate issue.

The expert simply may not invade the province of the Court "because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial." <u>Nieves-Villanueva v. Soto-Rivera</u>, 133 F.3d 92, 100 (1st Cir. 1997).

### 4. <u>Judicial Notice of Selected Rules of Professional Conduct</u>

In this case, the Court properly allowed judicial notice of selected Rules of Professional Conduct. The government relies on its previously filed memorandum in support of its Motion to Take Judicial Notice containing its arguments in support of this issue. Any risk of unfair prejudice here was eliminated by several measures taken by the Court prior to their introduction. These included limiting and redacting those rules that were introduced, as well as giving a specific limiting instruction prior to the presentation of the rules to the jury. The jury was instructed that such rules standing alone could not form the basis of criminal liability, that the government must prove beyond a reasonable doubt all essential elements of mail fraud, and that the jury may, but was not required to consider such rules in connection with all the other evidence in the case. To further insure that the rules were not given undue emphasis, the Court directed that the government read the rules to the jury rather than having the Court do it directly. The government took no steps to emphasize the rules with the jury and never mentioned them during opening, closing or any stage of the trial other than when they were read to the jury. There is no reason to believe that the jury placed undue emphasis on the rules, were confused by them and/or disregarded the Court's limiting instruction concerning them. To the contrary, during their deliberations, the jury sent several notes that requested many specific items of evidence, but never requested Ex. 45, the copy of the selected rules. Based on this record, there is no merit to defendant's contention that the presentation of the rules during the trial represented any unfair prejudice to him.

WHEREFORE, it is respectfully requested that the Court deny defendant's Motions.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

_____
DIANE G. LUCAS, D.C. Bar #443610
JOHN D. GRIFFITH, Iowa Bar #4622
ASSISTANT UNITED STATES ATTORNEYS
555 Fourth Street, N.W. Fifth Floor
Washington, D.C. 20530
(202) 514-8097 (Lucas)
(202)353-2453 (Griffith)